WILLIAM I. TOOP ET AL., APPELLEES AND CROSS-APPELLANTS, v. FRANK PALMER ET AL., APPELLANTS AND CROSS-APPELLEES.

FILED FEBRUARY 26, 1915.   No. 17,852.

Vendor and Purchaser: FRAUD: RIGHT TO RELIEF. Plaintiffs, citizens of this country and residents of sister states, were sole heirs of the owner of a farm, in Butler county, who died intestate and without issue. There were living nonresident aliens of the same degree of kinship to the decedent as plaintiffs. Plaintiffs had not been advised as to their legal rights, and supposed that their alien kinsmen were joint heirs with them to the said farm, in the proportions of one-third to them and two-thirds to such aliens. Defendant Palmer, acting for himself and for those who subsequently formed the defendant land company, with full knowledge of the mistaken belief under which plaintiffs were laboring, induced them to sell the land to him for a sum based upon the valuation of a one-third interest therein. He at the time did not inform plaintiffs of their mistake, but added to their belief that

they only owned a one-third interest by representing to them
that he intended to purchase the other two-thirds interest from
the alien heirs. *Held* a fraudulent transaction from which plain-
tiffs are entitled to be relieved, as against the defendant Palmer
and all others acting in concert with him in said fraudulent
transaction, or who subsequently obtained any title or interest
in the land, directly or indirectly, with knowledge of his fraud.

APPEAL from the district court for Butler county:
GEORGE F. CORCORAN, JUDGE. *Affirmed.*

*R. S. Norval, L. S. Hastings* and *E. A. Coufal,* for ap-
pellants.

*Hall & Bishop, R. C. Roper* and *C. M. Skiles, contra.*

HAMER, J.

The defendants, Frank Palmer and the Ulysses Land
Company, appeal from the judgment of the district court
for Butler county. John Toop, who was born in England,
located in Butler county, Nebraska, during the year 1884.
He continued to reside in that county until July 28, 1897,
when he died intestate, seized in fee of 160 acres of land
in that county near Ulysses, and being the premises in con-
troversy. He left surviving him Sarah A. Toop, his widow,
who resided with him upon the premises, and the follow-
ing next of kin, to wit: The children of Betsey Orchard,
who was a deceased sister; and the children of William
Toop, who was a deceased brother, all of whom were En-
glish citizens and residents of England, and shall here-
after be referred to as such English kin; Emily Tremlin,
of Pinconning, Michigan, and Sarah Jane Dyer, of Kane
county, Illinois, being the children of Mary Ann Plowman,
a sister of Mr. Toop; and William I. and Jesse Toop and
Florence Behrend, all of Auburn, Iowa, who were the
grandchildren of Mrs. Plowman, the surviving issue of
William Toop, a deceased son of Mary Ann Plowman.

Unless the English kin inherit, the sole heirs at law of
John Toop at his death, aside from his widow, were Mrs.
Tremlin and Mrs. Dyer. The English kin were related to
John Toop in the same degree as were Mrs. Tremlin and

Mrs. Dyer. Whether or not they inherit depends upon the efficiency of our statute barring aliens from inheriting, which is now in litigation in the supreme court of the United States in an action pending between the English kin and the defendants in this action. When John Toop died in 1897, he left a widow, who died in 1907. He left as next of kin children of a brother and sister, who were nonresident aliens, being citizens of England, above referred to, and he also left the children of a sister, the latter being residents and citizens of the United States, residing in Iowa, Illinois, and Michigan. It is claimed by the appellees that it is conceded, under section 10874, Ann. St. 1911, that nonresident alien heirs could not, and did not, inherit farm lands, and that no treaty was then in force abrogating the statute. It is therefore claimed by the appellees that it is conceded that the children of the deceased sister who reside in the United States, and were citizens of the United States, took the whole of the farm lands of which John Toop died seized, being a quarter section of farm land near Ulysses, valued at $20,000. There is also some town property, which is not in issue in this suit.

Soon after the death of Sarah A. Toop, the widow of John Toop, Frank Palmer, the principal defendant, talked to his brother Alfred R. Palmer, Reed Rihard, H. L. Pence and H. C. Withers about buying land. This talk was in the flouring mill at Ulysses, being the place where Pence worked, and where it is claimed these parties then met to talk over their business ventures. It is claimed by the appellees that Frank Palmer, before the meeting at the mill, had advised with two different attorneys as to whether the English heirs could inherit, and that he stated at the meeting that he had been advised that the English heirs did not inherit. It is also claimed by the appellees that those present at the meeting had good reason to believe that the American heirs did not know of the statute barring the English kin from inheriting, and were of the belief that the foreign kin took two-thirds of the estate.

It is further claimed by the appellees that, four or five days after the meeting at the mill, Palmer went to Iowa and Michigan to buy out the American heirs. The American heirs believing that they took but one-third of the estate, and being assured by Frank Palmer that such was the fact, and that he expected to buy out the English heirs, were quieted by these assurances, and, being ignorant of the real value of the farm, quitclaimed their interest in it to Palmer for a total sum of $5,000. At the time they did this, it is claimed by the appellees that these American heirs believed that they were selling and conveying one-third interest in the farm only, and that the English kin were entitled to the other two-thirds, which Palmer had stated to them he intended to buy.

On January 8, 1906, prior to this suit, Sarah Jane Dyer had conveyed to William I. Toop what they then both believed to be a one-third interest, but what was, in fact, as it is claimed by the appellees, a one-half interest. Before the commencement of this suit an amicable adjustment of their mistake was arranged between them to the satisfaction of both parties. For the purpose of this suit it is claimed by the appellees that William I. Toop has succeeded to all the rights and interests of Sarah Jane Dyer, and the latter does not ask for any relief in this suit. The only owners of the land, therefore, at the commencement of this suit, were William I. Toop and Mrs. Tremlin, who owned a half interest each; the other plaintiffs, as it is claimed by appellees, probably not inheriting under the construction of our statutes.

When Frank Palmer returned from Iowa and Michigan with his quitclaim deeds, he immediately placed them on record, and then claimed to be sole owner of the quarter section, which, it is claimed by appellees, is of the value of $16,000 to $20,000, and for which he had only paid $5,000. It is said that he then called together the same parties who had met at the mill and planned his trip, "the mill conspirators," and suggested the organization of the Ulysses Land Company, to play the role of "innocent purchasers." It is claimed by the appellees that Palmer then became presi-

Toop v. Palmer.

dent and manager of this Ulysses Land Company, the chief purpose of which, if not the only purpose, being to hold the title as an "innocent purchaser." Palmer then conveyed to this company. It is further claimed by the appellees that, with the view to further cover up the property, the company borrowed $6,000 of the Northwestern Mutual Life Insurance Company, although, as it is claimed by the appellees, the evidence shows that this land company had no use for the money. It is then said by the appellees that Pence moved to Kentucky, being first paid $1,000 for his interest in the spoils of the conspirators, although he had not put a dollar into the deal.

When the American heirs learned that the English heirs did not inherit, they brought suit to cancel their deeds to Palmer on the ground of fraud and conspiracy, misrepresentation, and mistakes of fact, and tendered back to defendants the $5,000 paid them by Palmer.

The district court found for the plaintiffs, setting aside the deeds and decreeing that the $5,000 tendered should be applied on the $6,000 mortgage of the Northwestern Mutual Life Insurance Company, but allowing the defendants to retain the $1,000 remainder of the loan. The defendants appeal generally, and the plaintiffs appeal from that part of the decree allowing the defendants to retain the $1,000 mentioned.

It is claimed by the appellees that Frank Palmer, who personally procured the deeds above mentioned, was the principal participant in a series of fraudulent acts. Some of the matters charged against Mr. Palmer do not appear to have any connection with this case, and as to these matters we will not take any time or expend any labor; we will consider those matters only which appear to be connected with this transaction. It is charged that his brother, Alfred R. Palmer, his wife, Lillian Palmer, Reed Rihard, his business partner, and H. C. Withers and H. L. Pence, his two intimate friends, were engaged with him in the organization of the Ulysses Land Company. The answer denied all of the alleged fraudulent acts upon the part of Palmer and his associates. Palmer testified that he

never told any of the persons associated with him in the deal what he paid for the land, nor "anything about how he got the deeds," not even his wife.

Mr. Pence testified that they met at the mill about four days before Palmer went to Iowa and got the quitclaim deeds which the court below canceled and set aside. The witness further testified that at this meeting "Frank Palmer said he knew of land that he thought would be for sale soon, known as the Toop estate." The understanding of the American heirs seems to have been that two-thirds would go to the English heirs and one-third to the American heirs. The American heirs were the sole and only heirs who did inherit. Palmer stated in a conversation with Mr. McGovan that he felt pretty safe because he had the opinion of the two lawyers, naming them, that the English heirs did not inherit. The scheme to get the deeds appears to have been a joint affair, although Palmer was more active in the transaction than any one else. Mr. Pence admitted that Mr. Palmer paid him $1,000 for his share of the profits in the transaction. This fact was also stated by Mr. Palmer to S. E. Robey. Whatever Pence got out of the deal, whether it was $1,000 or $775, or any other sum, he was in any event well paid, because he did not invest a cent. Mr. Pence claims that the organization of the company was suggested by Mr. Palmer after he got back from buying the land and when he "got the deeds for it in his name." The parties who organized the company seem to have all participated in the transaction.

It is claimed on behalf of the appellees that there is no evidence in the record showing that Palmer sought to relieve the American heirs of their belief that the English heirs took two-thirds of the estate. As a matter of fact, William I. Toop was the owner of one-half of the estate. Mr. Toop believed that the English heirs had a two-thirds interest in the estate. He told Palmer at the bank before the contract was signed for his share that he (Toop) in 1906, while the widow was still living, had tried to buy out the English heirs, but had failed. Mr. Palmer then

Toop v. Palmer.

remarked "that he wanted to buy them out if he could buy them right."

The evidence shows that Palmer undertook to establish in the minds of the American heirs, who actually inherited the property, the idea that their interest was a comparatively small interest, because of the fact that the English kin were also heirs and that they held two-thirds of the estate. An examination of the testimony shows that this idea was continually kept before the heirs that Mr. Palmer met. Palmer knew that there were no English heirs; that, while they were English kin, they were not heirs, and could not inherit the property; and that, by reason of that fact, the interest of the American heirs was very much increased. He successfully practiced this deception. He knew that the representations that he was making to Toop and the other heirs were fraudulent, and he made these representations apparently with the intent to deceive and obtain this property for little or nothing. The evidence also shows that the Ulysses Land Company was organized in furtherance of the scheme to defraud the plaintiffs. This is one of the cases where the facts cannot be dwelt upon without saying things that seem to be harsh.

The knowledge which the defendants had of the actual condition of the title and ownership of the land they kept to themselves, and they thereby deceived and misled the plaintiffs as to material facts within their knowledge, when common honesty required a truthful statement. To deny the plaintiffs relief would be to shield and encourage fraud. We are unable to find any reason for setting aside the judgment of the district court. We think it is right, and it is

AFFIRMED.

LETTON, ROSE and SEDGWICK, JJ., not sitting.